UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:05CR 181 HEA |
| ) | |
| NORMAN MEDLEY, ) | |
| ) | |
| Defendant(s). ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The defendant is charged by Indictment with Being a Felon in Possession of Ammunition. The defendant has filed Defendant's Motion to Suppress Evidence and Statements (Document #24). The government has filed Government's Response to Defendant's Motion to Suppress Evidence and Statements (Document #28). An evidentiary hearing followed.

**Factual Background**

At 12:30 P.M. on December 8, 2005, the Dunklin County Sheriff's Office was contacted concerning a residential burglary. Deputy Randal Midkiff responded to the location of that crime, at 15596 County Road 549, Kennett, Missouri. This was the residence of Bruce Herron. The deputy determined that the house had been broken into between 5:40 A.M. and 11:30 A.M. Several firearms were taken, as well as a ceiling fan, a DVD player and other items. Two of the firearms taken were described as a Savage, .270 caliber rifle and a .30-06 caliber rifle.

Two suspects were identified as possibly being involved in the burglary, Chris Johnson and Dennis Lebo. Johnson and Lebo were picked up and interviewed. They admitted breaking into Herron's house and stealing the firearms and other property. They took six of the stolen firearms to

- 1 -

Britney Hickman's residence and put them in a shed. They took some of the other property and the .270 caliber rifle and the .30-06 rifle to Norman Medley. Medley is a resident of Dunklin County, Missouri. Johnson and Lebo said that Medley was going to make a later delivery of methamphetamine to them in exchange for the two rifles.

A deputy contacted Mark McClendon of the Missouri State Highway Patrol. He arrived and talked with both Johnson and Lebo.

Johnson and Lebo agreed to wear recording devices and return to Medley's house to talk with him. They were both outfitted with recorders and allowed to return to Medley's house. They were also wearing radio transmitters which allowed the officers to hear the actual conversation. Johnson and Lebo found Medley at his house at around 9:00 P.M. Medley made statements concerning a .270 caliber and a .30-06 rifle. Medley stated that the .270 caliber rifle was the one that he got and that it would not get dirty where he put it. Medley also talked about the later delivery of methamphetamine. He said that his source only had a gram and that he needed more than 30 minutes to obtain more. Medley and the two suspects talked about how the .270 rifle looked like the .30-06 rifle. Medley mentioned that he would not mind finding some AK-47's.

Around 9:50 P.M., Mark McClendon and several other officers went to the Medley house. The other officers were Dunklin County Deputies Midkiff and Marcus Hopkins, Bootheel Drug Task Force Agents Higgins and Decker and Missouri State Highway Patrolman Scoggins. The officers intended to arrest Medley for the felony of Receiving Stolen Property. They did not have an arrest warrant.

Hopkins knocked on the door. Medley replied from inside, asking who it was. Hopkins replied, "It's the police, open up." There was no further reply. After about three seconds, Hopkins kicked at the door. The entry door to the Medley house was a very thin door. The kick cracked a

portion of the door, allowing Hopkins's foot to partially enter the home. The bottom part of the door swung into the house like a flap and then snapped back shut. Hopkins's foot caught in the door, causing him to fall to the porch. The door was still in one piece. The door was not forced open, and no deputy entered the house at that time.

Medley then called out, "Hold on." He opened the door and allowed the officers to enter the house. McClendon told Medley to keep his hands up. McClendon told Medley that they were at the residence to see about some stolen property.

McClendon then asked Medley if he would empty his pockets. Medley agreed to do so and took out a prescription bottle containing three peach-colored pills. The prescription bottle was in Larry Galloway's name and was for a generic Valium.

McClendon asked Medley why he was holding Larry Galloway's prescription medication. Medley stated that Galloway had left it at the residence and he was holding it for him.

McClendon then gave Medley the Miranda warnings. Medley said he understood his rights.

Midkiff and McClendon told Medley that they had information that some stolen property was at his residence. They asked for permission to search. Medley agreed to allow the search. He said he did not know anything about the stolen property. Later, Medley stated that two guys had given him a DVD player earlier that day around 5:00 P.M. He identified the two men as Johnson and Lebo. Medley said that Johnson and Lebo had brought a bunch of guns to his residence, but he told them to leave because he did not want them. While the search was taking place, Medley signed a consent to search form.

During that search, the officers found and seized:

    (1)    Loose marijuana and a marijuana cigarette on a shelf in the living room; and

    (2)    4 Super X .22 caliber rounds with the marijuana; and

(3) A black "Mudd" case containing 6 rounds of Winchester, .270 caliber ammunition on a shelf in the living room; and

(4) A Regent DVD player hooked up to a television in the living room; and

(5) A boxed ceiling fan from a closet.

McClendon then asked Medley about the .270 caliber ammunition. Medley stated that he unloaded the .270 caliber rifle that Johnson and Lebo brought to his residence. McClendon asked why. Medley stated that it was safer if they traveled with the firearm unloaded. Medley stated that the ceiling fan was not stolen and that he bought it for $10 at a yard sale. Medley denied receiving any firearms.

Medley was then arrested on state charges related to the stolen property and the marijuana.

Later, McClendon was notified that Medley wanted to speak with him at the Dunklin County Jail. On December 15, 2005, McClendon met with Medley. Medley was again "Mirandized" and he agreed to make a statement.

Medley asked McClendon if he could help get his federal firearms charges dropped. McClendon said he could not do that but would relay any information Medley could provide to the prosecutor. McClendon said it was possible that the prosecution would look favorably on him if he took responsibility for his actions and admitted what happened.

Medley then stated that Johnson and Lebo came by his residence with several guns and asked if he was interested in them. Medley told them no, but he did take a DVD player that they offered to him. Medley said he did not give them anything or promise a later delivery of anything in exchange for the DVD player. Medley said that he offered to help Johnson and Lebo hide the guns. He told them of a place to hide the guns near a field road near his house. Johnson and Lebo hid the guns in that spot. After Johnson and Lebo left his residence, Medley went to the hiding place and took out

the .270 caliber rifle. He unloaded the rifle and took the ammunition back to his house. Medley then hid the .270 rifle in a different location. He said he unloaded the rifle because he thought Johnson and Lebo were under the influence of methamphetamine.

Medley then said that another man came by his residence and inquired about the .270 rifle. Medley told the man where he had hidden the gun. The man left to get the .270. Medley would not identify this man.

## **Discussion**

In Defendant's Motion to Suppress Evidence and Statements, the defendant alleged the following grounds:

    (1)    Officers made an unlawful entry into the defendant's home because an officer without a search warrant kicked the door, causing it to open.

    (2)    Consent to search the home was neither asked for nor given.

    (3)    Search of the defendant's home without consent was illegal and the evidence seized should be suppressed.

    (4)    The consent to search form was not presented to the defendant until after the search was completed. The form was not signed voluntarily. The consent was demanded not requested.

    (5)    Seizure of the pill bottle and its contents was made in the absence of any legal justification and should be suppressed.

Deputy Hopkins had knocked on the door and Norman Medley responded, "Who is it?" The officers announced it was the police and Medley needed to open the door. After three seconds and there was no answer from inside, McClendon told Hopkins to go ahead and kick the door. Sergeant McClendon testified that although he indicated to Deputy Sheriff Hopkins that he should kick the door, and as a result of the kick part of the door pushed in but then snapped back, the door did not open. Medley then said, "Hold on, I'm coming" and opened the door. When Medley opened the

door, he stepped back, and McClendon asked him to keep his hands up where they could be seen and Medley did that. The officers did not go inside until after Medley had opened the door and stepped back.

As the government points out, Section 544.200 RSMO (2002), in effect since 1855, provides: "To make an arrest in criminal actions, the officer may break open any outer or inner door or window of a dwelling house or other building, or any other enclosure, if, after notice of his office and purpose, he be refused admittance."

The legality of the entry under this Missouri statute depends partially on whether the officers had sufficient probable cause to make a warrantless arrest inside the house. United States v. Easter, 552 F.2d 230, 233 (8th Cir. 1977).

## **Probable Cause**

Members of the Dunklin County Sheriff's Office on December 8, 2005, investigated the burglary of Bruce Herron's home. Firearms were taken, as well as a ceiling fan, a DVD player and other items. Two of the firearms taken were described as a Savage .270 caliber rifle and a .30-06 caliber rifle. Two suspects, Chris Johnson and Dennis Lebo, were picked up and interviewed. They admitted breaking into the house and stealing the firearms and other property. They told officers that they took the DVD player, a ceiling fan and the Savage .270 caliber rifle and the .30-06 caliber rifle to Norman Medley. Johnson and Lebo said that Medley was going to make a later delivery of methamphetamine to them in exchange for the two rifles. Both Lebo and Johnson, at the request of Sergeant McClendon, returned to Medley's house wearing wires. The recording devices had radio transmitters which allowed the officers to listen into the conversation. Medley made statements concerning a .270 caliber rifle and a .30-06 rifle. McClendon had this information before he and the other officers went to Medley's mobile home. Lebo and Johnson were reliable informants, in that

they had incriminated themselves by admitting the burglary and the distribution of the items stolen to various people, including Medley. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075 (1971). Johnson's and Lebo's original account of Medley's involvement was corroborated by their returning to the Medley mobile home and engaging Medley in conversation concerning the two rifles and the exchange of methamphetamine. Their detailed knowledge of the items taken in the burglary was a further indication of the reliability of the information concerning the burglary and Medley's receipt of the items. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329 (1959).

The court finds that the officers had probable cause to believe the defendant, Norman Medley, had received and was in possession of stolen property and, therefore, was subject to arrest.

### **Unlawful Entry?**

There is a question whether the officers waited long enough so that they would have been considered to have been refused entry under § 544.200. McClendon said there was a pause of three seconds or so between the officers announcing that they were the police and that Medley needed to open the door and the kick on the door. In this case, there were exigent circumstances. To justify a no-knock entry, the "police must have a reasonable suspicion" that knocking and announcing their presence under the particular circumstances would be dangerous or futile. Richards v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416 (1997). McClendon testified that Johnson and Lebo stated that Medley had made threats about "killing the cops if they came out there, and that kind of thing, that they knew that he had guns out there, and to be careful." (Tr. 54). See also Tr. 35-36, 63.

The court finds that the officers had exigent circumstances which would have excused their compliance with the knock-and-announce rule, as well as exemption from the requirement that they be refused admittance in accordance with § 544.200 RSMO. This is true even though they had no arrest warrant. Easter, 552 F.2d at 233; Root v. Gauper, 438 F.2d 361 at 365 (8th Cir. 1971). The

officers did not, in fact, make a forcible entry. Medley opened the door and stepped back inviting by his actions the officers to come in. See United States v. Garcia, 339 F.3d 116, 119-120 (2nd Cir. 2003)(consent voluntary and therefore search valid because suspect opened door and consented to the search). See also United States v. Carter, 378 F.3d 584, 588 (6th Cir. 2004)(consent to enter residence implied because defendant stepped aside to let police officers inside); United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002)(consent to enter trailer implied because defendant yielded right of way to officers).

The court finds that there was probable cause for the officers to arrest Medley for receiving stolen property. If the knock-and-announce rule would have been violated (the officers actually did not break open the door but entered only after Medley opened the door), compliance with the knock-and-announce rule would have been excused by exigent circumstances.

### **Consent to Search the Home**

The defendant alleges that consent to search the home was neither asked for nor given. Sergeant McClendon testified that he had told Medley that they had received information that there was stolen property on the premises and then he asked for Medley's permission to search the premises. McClendon testified that Medley was more than willing, that he, Medley, said that he did not know anything about stolen property but that they could search if they wanted to, Medley saying something like, "Sure, go ahead" or "Sure, you're welcome to search." (Tr. 19). At that point, the officers started to search. McClendon stated that Medley agreed to sign a consent to search form and while the search was proceeding, Medley signed the form.

The court assumes that the defendant's position as stated in his motion (the defendant did not testify) that no consent was asked for or given is based upon the testimony of Medley's girlfriend, Cassidy Bowles, who testified that she was in a position to hear if consent had been requested and

she did not at any time hear McClendon ask for consent. She later said the officers did not ask for consent. (Tr. 231). It is possible the defendant is taking his position because the public defender's investigator, Ronald D. Johnson, testified that Deputy Hopkins told him in an interview prior to the evidentiary hearing that he, Hopkins, did not hear any consent to search either asked for or given. (Tr. 191).

Cassidy Bowles was Norman Medley's 19-year-old girlfriend. She testified that she was present when the officers came into the mobile home. She and Norman had been sitting on a couch. She testified that when the officers came into the mobile home, they sounded "like they were in a good mood." (Tr. 220). They spoke in a normal tone of voice. Norman was not angry. His tone of voice was polite to the officer. There were no loud words or threats at that point. She said the officers said they were looking for guns and dope and stolen property as well. When asked if there was a conversation about a specific kind of stolen property, Bowles said, "Not that I heard." When asked why she had said, "Not that I heard," whether she had been taken to another room, Bowles replied that she stayed in the living room, but "There were just so many of them talking." She said she was not listening to the conversation between the officers and Medley. She said they talked, but she was not paying attention to all of it. (Tr. 221). She was also talking to other officers at that time. Id. She was aware that the officers found a pill bottle with three pills in it. She was aware that Medley was given the Miranda warnings. She was not paying attention to Medley at the time the pills were found, she was sitting on the couch in the living room talking with Sergeant McClendon. (Tr. 222). She stated that there may have been conversations between the officers and Medley that she did not remember or was not in a position to hear. Id. She stated that while she was there no one, including Norman Medley, her or Norman Medley's mother, asked the officers to leave. (Tr. 224). Medley knew the officers were searching the trailer. (Tr. 225).

Although Ms. Bowles said she at no time heard Medley give any officer consent to search the residence (Tr. 230-231), she is also the one that said that there may have been conversations between the officers and Medley that she did not remember and was not in a position to hear; she was speaking with Sergeant McClendon when the pills were found; she was speaking to other officers and was not listening to the conversations between the officers and Medley; and as she commented herself, "There were just so many of them talking." (Tr. 221).

The court finds that the testimony of Cassidy Bowles does not negate the clear, unambiguous testimony of Sergeant McClendon, that he asked Norman Medley for consent to search and that Medley provided the consent. (Tr. 19).

There is another consideration concerning the testimony of Cassidy Bowles. Dennis Lebo had been called during the evidentiary hearing on February 23, 2006, to testify on behalf of Defendant Medley. The court felt it would be appropriate that Mr. Lebo have representation because there was the possibility that he could incriminate himself. The next morning, February 24, 2006, Dennis Lebo was cross-examined by the Assistant United States Attorney and testified that he had testified falsely the day before because Norman Medley had told him to so testify. (Tr. 87). Their conversation had taken place on February 23, 2006, in the holding cell at the Federal Building. Lebo further stated that he had been threatened previously by Medley. When he was at the Dunklin County Courthouse, Lebo had been threatened by Medley that he would kill Lebo when he got out. He felt that Lebo was the reason Medley had received "federal time." (Tr. 91). That statement was made directly to Lebo from Medley. Id. With respect to Cassidy Bowles, Ms. Bowles was nineteen years old, and Norman Medley was forty in December of 2005. They had been living together for three months. The experience of Dennis Lebo with Norman Medley and Medley's alleged attempt to suborn perjury

should make a fact-finder cautious about accepting the testimony of a witness over whom Norman Medley could exert strong influence.

A most telling testimony in support of the fact that Norman Medley had given consent to the search of his home comes from someone who in no way was biased in favor of law enforcement and against Norman Medley, Mr. Medley's mother, Barbara June Medley. She was called by the defendant to testify. When Mrs. June Medley, who was looking from her home, realized the police were at the trailer where Norman and Cassidy were, she went on down to the trailer and walked in and said, "What's going on?" (Tr. 119). An officer told her that it did not concern her but that the officers received a report of stolen items and guns. Mrs. Medley looked around and the officers were searching the house. When Mrs. Medley was observing the officers searching chairs and cushions and she was looking around, Norman Medley said, "Mom, go back up to the house. I'll be up there in a little bit." (Tr. 125).

Mrs. Barbara June Medley testified that "Norman told me to go back up to the house, he would be up there in a little bit. I figured, well, there wasn't anything going on, they just got a report and was searching, and Norman would be back up there, and he would tell me what was going on."

Mrs. Medley said that when Norman told her to go back to the house, that it was okay and he would be up there in a minute, she said Norman was cooperative. She said, "They was all laughing." (Tr. 139). Norman's attitude was "friendly. He wasn't upset." (Tr. 139) .

Mrs. Barbara June Medley's description of the scene at the mobile home while the search was going on supports the officers' testimony that Norman Medley had consented to the search of the mobile home. If Medley had any objection to the search, certainly when his mother came to the mobile home and wanted to know what was going on, that was the time when he could have

complained. He told his mother that she should go back up to the house and he would be up there in a little bit. Mrs. Medley's reaction was, "I figured, well, there wasn't anything going on ...." (Tr. 128).

The court accepts as true the testimony of Mark McClendon that he asked for consent to search for stolen property and Mr. Medley consented. (Tr. 19). The court accepts also the testimony of Deputy Sheriff John Higgins:

> Sergeant McClendon advised Mr. Medley that we were there investigating stolen property that was supposed to be on his property. Sergeant McClendon basically asked Mr. Medley if he cares if we search for the stolen property, and again, you know, Mr. Medley was very cordial and cooperative and said he did not mind if they searched.

(Tr. 238). Deputy Higgins had testified also that Mr. Medley opened the door on the inside of the trailer and that neither he nor any officer assisted in pushing the door open. The deputy testified that all the officers were just standing outside the doorway in the yard waiting and after the door was opened by Mr. Medley, the officers eventually went inside. (Tr. 237). Deputy Higgins testified that after Medley gave his consent, the officers started searching the house. (Tr. 238).

Although in one other of his points the defendant claims that the consent to search form he signed was signed after the search was made, that question will be taken up separately; however, the fact that a written consent form was signed by the defendant argues strongly that the defendant did give his consent.

The court finds that Defendant Norman Medley gave his consent to the search of the mobile home where he was located at the time conducted by Sergeant Mark McClendon and the other officers on December 8, 2005.

The question of whether the consent given by Norman Medley was voluntary is determined by the totality of the circumstances. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222, 93 S.Ct. 2041,

2045 (1973); United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990). Chaidez lists the following characteristics of persons giving consent as relevant when a court is assessing the voluntariness of that consent: (1) the person's age; (2) his general intelligence and education; (3) whether he was intoxicated or under the influence of drugs when consenting; (4) whether the person consented after being informed of his right to withhold consent or of his Miranda rights; (5) whether the person because he had been previously arrested was aware of the protections afforded to suspected criminals by the legal system. Id. at 381.

Viewing Mr. Medley in the application of those characteristics: (1) Norman Medley was forty years old on December 8, 2005. (2) He showed every evidence of being intelligent in answering questions of the officers. He was careful to deny that he had possession of the rifles that Lebo and Johnson had brought to the mobile home. He explained his possession of the .270 caliber ammunition, which the officers had already discovered for themselves, by saying that he unloaded the rifles so that they would be less dangerous when his two visitors traveled with the weapons. He blended truth with falsehood when he said the DVD player had been given to him by two persons earlier that day, about 5:00 P.M., and identified Johnson and Lebo. He said he had bought the ceiling fan, which officers found and which was part of property stolen in the earlier burglary, at a yard sale. Medley certainly had enough intelligence to understand what he was doing when he consented to the search. (3) Although Cassidy Bowles testified that she had been smoking marijuana with "the boys" (Tr. 199), she stated that Medley did not smoke marijuana. (Tr. 212). Consequently, there is no evidence that Medley was intoxicated or under the influence of drugs when he consented. (4) Medley had been given his Miranda rights before he gave his consent. (5) Mr. Medley was well aware of the protections afforded to suspected criminals by the legal system. The indictment charges that he had previously been convicted of the following felonies: on June 9, 1993, Distribution of a Controlled

Substance; on May 10, 2000, Felonious Restraint; and on June 22, 2005, Tampering with a Motor Vehicle. The list of convictions does not contain the other times when Mr. Medley may have been arrested and provided with his constitutional rights.

All of the above factors set out in Chaidez are in favor of the consent given by Norman Medley being voluntary.

The Chaidez case also examined the environment in which consent was given. The factors to be considered are: (1) was the suspect detained and questioned for a long or short time; (2) was the suspect threatened, physically intimidated, or punished by the police; (3) did the suspect rely upon promises or misrepresentations made by the police; (4) was the suspect in custody or under arrest when the consent was given; (5) was the suspect in a public or secluded place; (6) did the suspect either object to the search or stand by silently while the search occurred.

Applying the factors to Norman Medley's situation: (1) The consent occurred shortly after the Drug Task Force arrived. McClendon stated that the officers approached the mobile home at 9:50 P.M. and the permission to search written form reflects that it was signed at 10:20 P.M., approximately 30 minutes between the time the officers approached the mobile home and the time the form was signed. (Tr. 44). The oral consent to search was given before the form was signed. The search was begun after the oral consent was given. (2) Medley was not threatened, physically intimidated or punished by the police. He was very cooperative and friendly according to all reports. In fact, Medley's mother, Mrs. Barbara June Medley, testified when she was asked if Norman was cooperative, "Well, yeah, they was all laughing." Asked about Norman's attitude, she responded, "It was friendly." "He wasn't upset." (Tr. 139). When Cassidy Bowles, Norman Medley's girlfriend, was asked what the tone of conversation between the officers and Medley was, she stated that they talked as if they had talked before. The tone of the conversation when the officers first came

in was "They seemed happy, I guess. They weren't mean." (Tr. 219). "They were sounding like they were in a good mood." (Tr. 220). Bowles testified that the officers spoke in a normal tone of voice and when asked about Medley's tone of voice, she replied, "He was normal." Id. He was not angry with the officers. He talked with the officers. His tone of voice was polite to the officers. When asked if there really weren't any loud words or threats at this point, Cassidy Bowles replied, "No." (Tr. 220). (4) When the consent was given, Medley was not in custody or under arrest, but he was, at that time, detained. (5) The consent was not given in a public place but was in a place that was like Medley's home. (6) Medley did not object to the search but stood by while the search occurred. Cassidy Bowles testified that neither she nor Norman Medley nor Norman Medley's mother asked the officers to leave. (Tr. 24). She stated that Medley knew that the officers were searching the trailer. (Tr. 224-25).

With regard to Ronald D. Johnson, the investigator for the Public Defender's Office, the court has no reason to suspect that Mr. Johnson was not truthful. Except for what Mr. Johnson testified to, the court finds no reason to find that Deputy Hopkins was not telling the truth when he testified that when the officers came into the residence, he heard one of the officers asking Mr. Medley for consent and when asked what the response was, Deputy Hopkins testified, "He was cooperative. He said yes." (Tr. 176). Hopkins also testified that he did not believe that he told Mr. Johnson that he did not hear Mr. Medley give consent to search because of his late entry into the interior of the trailer. Id. The court will not assign credibility to one over the other but will discount the testimony of both Investigator Johnson and Deputy Hopkins and will not consider it.

Under the totality of circumstances, the court finds that the oral consent to search given to the officers by Norman Medley was voluntary, and the search was constitutionally valid. Schneckloth

v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998).

### Should the Evidence Seized be Suppressed?

In defendant's Motion to Suppress Evidence and Statements, the defendant alleged that the search of the defendant's home without consent was illegal and as a result, the evidence seized should be suppressed. The court has found that the search of the defendant's home was with consent, was not illegal and as a result, the evidence seized should not be suppressed.

### Time the Consent Form Was Signed

The defendant argues that the consent to search form was not presented to the defendant until after the search was completed; the form was not signed voluntarily; and the consent was demanded not requested. The evidence from Sergeant McClendon and Deputy John Higgins was that after the oral consent was given, the search began. Later, the written consent to search form was signed. It really makes no difference when the form was actually signed. The officers did not need a signed written consent to search form as long as they had received oral consent. In the same way, a written waiver of Miranda rights is not necessary. Even though a defendant refused to sign a waiver but indicated his willingness to tell his side of the story, the waiver was valid. United States v. Yazzie, 188 F.3d 1178, 1192 (10th Cir. 1999); Mincey v. Head, 206 F.3d 1106, 1131-32 (11th Cir. 2000)(valid waiver properly inferred though defendant refused to sign written waiver because he "drew a sharp distinction between what he was willing to say and what he was willing to sign."). Medley does not claim he did not sign the waiver, but objects to when it was signed.

The defendant's motion alleges that the consent form was not signed voluntarily. The court, from examining the totality of the circumstances, has found that the consent to search was voluntary. There was no evidence presented that the consent to search form was not signed voluntarily.

According to Ms. Bowles, the consent for the written form was "demanded" not requested. This is at variance with other testimony, especially the testimony of McClendon. (Tr. 20).

The court has already called into question the testimony of Cassidy Bowles, who is subject to the direct influence of Norman Medley. She testified that Officer Midkiff, when he presented the form to the defendant, said, "Sign this damn paper, Mr. Medley." (Tr. 233). Such a commanding attitude is completely contradictory to the atmosphere of cordiality, cooperation and friendliness presented by the other witnesses. One wonders if the deputy would have called Norman Medley "Mr." if he were as demanding as Cassidy Bowles described. The court does not accept but rejects Cassidy Bowles's testimony in this regard. Even if she were correct, such a demand as she describes would not negate the fact that Medley had previously given his voluntary consent. See also United States v. Rivas, 99 F.3d 170, 176 (5th Cir. 1996)(consent to search house valid though consenter wrote "reluctantly" on consent form).

**The Pill Bottle and Its Contents**

In his motion to suppress, the defendant urges that seizure of a pill bottle and its contents from Norman Medley was made in the absence of any legal justification and should be suppressed. In its Response to the Defendant's Motion to Suppress Evidence and Statements (Document #28), the government stated that it would not offer McClendon's question or Medley's response in their case in chief if the matter goes to trial. The government conceded that Medley's reply was prior to his receiving the Miranda warnings and the government decided to resolve any constitutional question concerning Medley's response by agreeing that this statement can be suppressed. In its later Memorandum, the government stipulated that it would not offer any evidence of the pill bottle in its case in chief, either the actual bottle, the pills or the statement of Medley concerning the ownership of those pills. (Document #73, p. 5).

In view of the government's stipulation, the court will deny the defendant's motion to suppress evidence of the pill bottle or statements concerning the pill bottle as moot.

RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Document #24) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of November, 2006.