UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:05CR 181 HEA |
| | ) | |
| NORMAN MEDLEY, | ) | |
| | ) | |
| Defendants. | ) | |

## **REPORT AND RECOMMENDATION**

After the previous evidentiary hearings held on a prior Motion to Suppress Evidence and Statements, the undersigned entered a Report and Recommendation which was adopted by the trial judge, District Judge Henry E. Autrey.

There follows the Factual Background related in that Report and Recommendation.

### **Factual Background**

At 12:30 P.M. on December 8, 2005, the Dunklin County Sheriff's Office was contacted concerning a residential burglary. Deputy Randal Midkiff responded to the location of that crime, at 15596 County Road 549, Kennett, Missouri. This was the residence of Bruce Herron. The deputy determined that the house had been broken into between 5:40 A.M. and 11:30 A.M. Several firearms were taken, as well as a ceiling fan, a DVD player and other items. Two of the firearms taken were described as a Savage, .270 caliber rifle and a .30-06 caliber rifle.

Two suspects were identified as possibly being involved in the burglary, Chris Johnson and Dennis Lebo. Johnson and Lebo were picked up and interviewed. They admitted breaking into Herron's house and stealing the firearms and other property. They took six of the stolen firearms to

Britney Hickman's residence and put them in a shed. They took some of the other property and the .270 caliber rifle and the .30-06 rifle to Norman Medley. Medley is a resident of Dunklin County, Missouri. Johnson and Lebo said that Medley was going to make a later delivery of methamphetamine to them in exchange for the two rifles.

A deputy contacted Mark McClendon of the Missouri State Highway Patrol. He arrived and talked with both Johnson and Lebo.

Johnson and Lebo agreed to wear recording devices and return to Medley's house to talk with him. They were both outfitted with recorders and allowed to return to Medley's house. They were also wearing radio transmitters which allowed the officers to hear the actual conversation. Johnson and Lebo found Medley at his house at around 9:00 P.M. Medley made statements concerning a .270 caliber and a .30-06 rifle. Medley stated that the .270 caliber rifle was the one that he got and that it would not get dirty where he put it. Medley also talked about the later delivery of methamphetamine. He said that his source only had a gram and that he needed more than 30 minutes to obtain more. Medley and the two suspects talked about how the .270 rifle looked like the .30-06 rifle. Medley mentioned that he would not mind finding some AK-47's.

Around 9:50 P.M., Mark McClendon and several other officers went to the Medley house. The other officers were Dunklin County Deputies Midkiff and Marcus Hopkins, Bootheel Drug Task Force Agents Higgins and Decker and Missouri State Highway Patrolman Scoggins. The officers intended to arrest Medley for the felony of Receiving Stolen Property. They did not have an arrest warrant.

Hopkins knocked on the door. Medley replied from inside, asking who it was. Hopkins replied, "It's the police, open up." There was no further reply. After about three seconds, Hopkins

kicked at the door. The entry door to the Medley house was a very thin door. The kick cracked a portion of the door, allowing Hopkins's foot to partially enter the home. The bottom part of the door swung into the house like a flap and then snapped back shut. Hopkins's foot caught in the door, causing him to fall to the porch. The door was still in one piece. The door was not forced open, and no deputy entered the house at that time.

Medley then called out, "Hold on." He opened the door and allowed the officers to enter the house. McClendon told Medley to keep his hands up. McClendon told Medley that they were at the residence to see about some stolen property.

McClendon then asked Medley if he would empty his pockets. Medley agreed to do so and took out a prescription bottle containing three peach-colored pills. The prescription bottle was in Larry Galloway's name and was for a generic Valium.

McClendon asked Medley why he was holding Larry Galloway's prescription medication. Medley stated that Galloway had left it at the residence and he was holding it for him.

McClendon then gave Medley the <u>Miranda</u> warnings. Medley said he understood his rights.

Midkiff and McClendon told Medley that they had information that some stolen property was at his residence. They asked for permission to search. Medley agreed to allow the search. He said he did not know anything about the stolen property. Later, Medley stated that two guys had given him a DVD player earlier that day around 5:00 P.M. He identified the two men as Johnson and Lebo. Medley said that Johnson and Lebo had brought a bunch of guns to his residence, but he told them to leave because he did not want them. While the search was taking place, Medley signed a consent to search form.

During that search, the officers found and seized:

>   (1) Loose marijuana and a marijuana cigarette on a shelf in the living room; and
>
>   (2) 4 Super X .22 caliber rounds with the marijuana; and
>
>   (3) A black "Mudd" case containing 6 rounds of Winchester, .270 caliber ammunition on a shelf in the living room; and
>
>   (4) A Regent DVD player hooked up to a television in the living room; and
>
>   (5) A boxed ceiling fan from a closet.

McClendon then asked Medley about the .270 caliber ammunition. Medley stated that he unloaded the .270 caliber rifle that Johnson and Lebo brought to his residence. McClendon asked why. Medley stated that it was safer if they traveled with the firearm unloaded. Medley stated that the ceiling fan was not stolen and that he bought it for $10 at a yard sale. Medley denied receiving any firearms.

Medley was then arrested on state charges related to the stolen property and the marijuana.

Later, McClendon was notified that Medley wanted to speak with him at the Dunklin County Jail. On December 15, 2005, McClendon met with Medley. Medley was again "Mirandized" and he agreed to make a statement.

Medley asked McClendon if he could help get his federal firearms charges dropped. McClendon said he could not do that but would relay any information Medley could provide to the prosecutor. McClendon said it was possible that the prosecution would look favorably on him if he took responsibility for his actions and admitted what happened.

Medley then stated that Johnson and Lebo came by his residence with several guns and asked if he was interested in them. Medley told them no, but he did take a DVD player that they offered

to him. Medley said he did not give them anything or promise a later delivery of anything in exchange for the DVD player. Medley said that he offered to help Johnson and Lebo hide the guns. He told them of a place to hide the guns near a field road near his house. Johnson and Lebo hid the guns in that spot. After Johnson and Lebo left his residence, Medley went to the hiding place and took out the .270 caliber rifle. He unloaded the rifle and took the ammunition back to his house. Medley then hid the .270 rifle in a different location. He said he unloaded the rifle because he thought Johnson and Lebo were under the influence of methamphetamine.

Medley then said that another man came by his residence and inquired about the .270 rifle. Medley told the man where he had hidden the gun. The man left to get the .270. Medley would not identify this man.


Following the filing of a Superseding Indictment, the defendant filed Defendant's Motion to Suppress Statement (Document #128) which concerned a statement taken from the defendant at the Dunklin County Jail by Sergeant Mark McClendon of the Missouri State Highway Patrol on December 15, 2005. In the earlier Report and Recommendation filed by the undersigned magistrate judge, the court found that prior to the statement given by Norman Medley to Sergeant McClendon, Miranda warnings were given to the defendant. As related by defendant's attorney at the evidentiary hearing, the Second Motion to Suppress Statement requests a finding by the court whether the defendant's waiver of the Miranda warnings made on December 15, 2005, was made voluntarily. In the previous Report and Recommendation, there was no specific finding that the waiver was voluntary.

### Additional Factual Background

Shortly before the December 15th interview, McClendon was at the Dunklin County Jail where Medley was being held on state charges. One of the deputies informed McClendon that Medley wanted to talk with him. Based on that, McClendon asked the deputy to have Medley placed in an interview room so he could talk with Medley.

In addition, McClendon testified he did not make any threats or promises to Medley in order to obtain the December 15, 2005, statement. The meeting was held at the request of Medley. Medley wanted to cooperate and reduce the effect of any possible federal charge. McClendon told Medley, at the beginning of their conference, that he could not promise any benefit, but that he would pass along Medley's information to the prosecutor. Medley then made the statements previously set out.

### Discussion

Although the two paragraphs above in the Additional Factual Background set out a brief statement of the December 15, 2005, interview, a more detailed review of the testimony would be helpful.

Sergeant Mark McClendon testified that he met with Norman Medley at the Dunklin County Jail on December 15, 2005, after Chief Deputy Sheriff Wally Pointer contacted McClendon and told him that Norman Medley wanted to speak with him. McClendon testified that no one asked Medley to speak with or arranged for other officers to speak with Medley prior to the invitation from Medley for an interview.

The interview took place in the deputy sheriff's office in the jail. There was only one room for interviews at the jail and besides McClendon, there were no witnesses to the interview.

McClendon testified that Medley wanted to get into the reasons why he wanted to talk with McClendon, but McClendon stopped him and said that they should do the Miranda warnings before talking.

At an earlier evidentiary hearing on February 23, 2006, McClendon testified that on December 15, 2005, he advised Medley of his Miranda rights and had him sign a waiver of those rights. McClendon identified Exhibit 2 as the State Patrol's notification and waiver of rights with the Miranda warnings at the top and the waiver at the bottom, which is signed by Norman Medley and dated. Medley said he understood his rights and agreed to talk with McClendon.

Medley's initial question to McClendon was what he could do to lessen his charges or reduce his charges. McClendon said that wasn't his decision, but he would listen and pass along any information. Medley asked McClendon if McClendon could help with the federal charges that had recently been filed. McClendon told Medley that there was really nothing he could do about that and what he was facing. He told Medley that he knew prosecutors usually look favorably on cooperation, and he would pass along to the federal prosecutor what Medley told him.

McClendon stated that no promises were made to Medley if he would make a statement and no threats were made if Medley did not make a statement. McClendon had talked to Medley earlier on December 8, 2005, when he was arrested and had given Medley the Miranda warnings on that occasion. There was no contact by McClendon with Medley between December 8th and December 15th when he interviewed Medley at the Dunklin County Jail. McClendon knew of no contact by anyone else connected with law enforcement with Medley between December and 8th and December 15th.

The interview proceeded in a conversational tone, both on McClendon's part and on Medley's

part. There were no arguments or confrontations. Medley did not appear upset. He did not speak fast, nor was he sweating. There did not appear to be any bruises or any other injuries on Mr. Medley. Medley did not say that he had been pressured to talk to McClendon. McClendon testified that he was not aware of any other officer making promises to Medley if he made a statement or any other officer threatening Medley if he did not make a statement. The interview lasted about fifty minutes. Medley indicated that he was interested in becoming a confidential informant if it could assist him.

McClendon had testified earlier at the first evidentiary hearing on the defendant's earlier motion to suppress. (The court took judicial notice of the transcript of the earlier hearings at the government's request.) Medley started talking about putting something together drug-related and then talked about the guns themselves involved in his case, the .270 and the ammunition. Medley claimed that two guys brought out the guns to his home, and Medley initially didn't want anything to do with them but told the men where to hide them. He claimed he retrieved the .270 and unloaded it at his residence and then hid it at a second location. Later Medley said a person whom he did not want to identify came by, and Medley told him where to find the gun and that person got the .270.

On cross-examination, McClendon stated that he had met Medley before three or four times in connection with law enforcement duties. McClendon testified that the office where the interview at the Dunklin County Jail took place was enclosed, had a desk, a computer and file cabinets. The defendant was not in handcuffs when he came in, nor was he in handcuffs at any time during the interview. McClendon did not ask if Medley was feeling all right, because he appeared to be fine. McClendon did tell Medley that federal prosecutors look favorably on defendants who take responsibility for their actions. McClendon testified that he may have said that Medley was looking

at a lot of time. McClendon said that he did not know if Medley was on parole at that time.

McClendon said he did not audiotape the interview, and he has never audiotaped an interview. He thought he had his notes from the interview back at his office.

McClendon testified that he did not feel that Medley was being honest with him. McClendon told Medley that he would make known to the prosecuting attorney that Medley had spoken to McClendon. McClendon expressed the opinion that he thought the defendant's talking to McClendon was doing everything Medley could to help himself out. McClendon testified that after December 15th he had no other conversation relating to these charges with Mr. Medley.

McClendon testified that, in making his responses to questions by McClendon, Medley was coherent and he seemed to understand the questions; however, the story he told did not make sense to McClendon. Medley's mind seemed clear. McClendon testified there was no reason to believe the defendant did not know what he was doing.

Because McClendon did not think Medley was telling the truth, he was not going to use Medley as a confidential informant.

Chief Deputy Sheriff Wally Pointer testified that Norman Medley had been in jail between fifteen and twenty times. He stated that Medley waits a couple of days after he is brought into jail and then asks to talk to the Sheriff or to the Chief Deputy and asks if he can give information about criminal activity to help himself out. In the present case, he would have talked to the jailer about talking to McClendon. The jailer would have passed along the request to Pointer, telling Pointer that Medley wanted to talk to Sergeant McClendon and Pointer contacted Sergeant McClendon. Pointer knew of no promises made to Medley if he

spoke to McClendon, and he knew of no threats to Medley if he did not make a statement.

**The Law**

To determine if testimonial evidence supplied by a defendant is involuntary, a court must ask whether, in the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused. Haynes v. Washington, 373 U.S. 503, 513-14 (1963); see also Townsend v. Sain, 372 U.S. 293, 307 (1963) (test for involuntariness is whether suspect's will was overborne or whether confession was product of rational intellect and the free will), overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992). The factual inquiry centers upon (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure. In Colorado v. Connelly, 479 U.S. 157, 170 (186), the Supreme Court emphasized that coercion by a state actor is a necessary element to satisfy this test; see also United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990), cert. denied (1991). See United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004) (confession voluntary despite defendant's illness during interviews and absence of attorney because police conduct was not so coercive as to overcome the defendant's will).

To determine whether a defendant's statement is the product of coercion and, therefore, involuntary, courts commonly consider the following factors: (1) the location of the questioning (Miranda v. Arizona, 384 U.S. 436, 457-58 (1966)); (2) whether Miranda warnings were given (Simmons v. Bowersox, 235 F.3d 1124, 1132-34 (8th Cir. 2001) (confession voluntary in part because videotaped statement by defendant admitting he

received Miranda rights and chose not to exercise them); and (3) whether the accused initiated contact with law enforcement officials (United States v. Chipps, 410 F.3d 438, 444-45 (8th Cir. 2005) (incriminating statement voluntarily made during conversation not initiated by officer, evidenced by 1-minute period of silence preceding statement).

With regard to the three factors just mentioned, (1) the location of the interview was the only office or room used for interviews in the Dunklin County Jail. It was not intimidating. Contrast this location with that in United States v. Glauning, 211 F.3d 1085, 1087 (8th Cir. 2000) (confession voluntary despite defendant being questioned by 2 large policemen in bathroom); (2) Miranda warnings were given. The defendant said he understood them and agreed to speak with Sergeant McClendon; (3) It was the defendant who initiated the request for an interview with Sergeant McClendon.

Some times courts look at personal characteristics such as: (1) youth - Norman Medley was 40 years old on December 15, 2005, in contrast to Simmons v. Bowersox, 235 F.3d 1124, 1133-34 (8th Cir. 2001) (confession voluntary because 17-year-old defendant with IQ of 88 stated on videotape that he understood his rights and had not been coerced by police); (2) drug problems - Cassidy Bowles testified that she had been smoking marijuana with "the boys" (Johnson and Lebo), but she also stated that Medley did not smoke marijuana. Bowles was referring to December 8, 2005, when she made that statement. On December 15, 2005, Medley had been in custody for a week and was not under the influence of any drugs. See also United States v. Contreras, 372 F.3d 974, 977-78 (8th Cir. 2004) (confession voluntary despite defendant's recent methamphetamine and marijuana use

-11-

because defendant appeared sober and no police coercion was alleged); (3) psychological problems - there was no indication that Norman Medley had or has psychological problems; (4) physical condition - Medley appeared competent, understanding the questions asked, not upset, showing no signs of physical abuse and interview conducted in conversational tones by both participants; and (5) experience with the criminal justice system - Mr. Medley was well aware of the protections afforded to suspected criminals by the legal system. The Indictment charges that he had previously been convicted of the following felonies: Distribution of a Controlled Substance; Felonious Restraint; and Tampering with a Motor Vehicle. Chief Deputy Pointer testified that Medley had been in the Dunklin County Jail fifteen to twenty times.

Absolutely no evidence was presented indicating coercion on the part of law enforcement officers. All the evidence points to the fact that Norman Medley's will was not overborne.

In United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996), the Eighth Circuit Court of Appeals found Co-defendant Wheeler's statement voluntary although she had been told that if she did not cooperate she would be arrested immediately. The Eighth Circuit also made reference to the interrogation of Wheeler:

> Finally, the agents' promise that they would make Wheeler's cooperation known to the United States attorney did not transform an otherwise voluntary statement into an involuntary one. See United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (promise of leniency, by itself, does not make confession involuntary); United States v. Harris, 914 F.2d 927, 933 (7th Cir. 1990) (police may solicit confession by offering to reduce charges against defendant).

The district court placed emphasis on Agent Stepleton's statement that Wheeler would be arrested immediately if she did not cooperate. We conclude, however, that this single statement was not so coercive as to deprive Wheeler of her ability to make an unconstrained decision to confess. See United States v. Hocking, 860 F.2d 769, 774 (7th Cir. 1988) (FBI agents' threats that defendant faced criminal charges and imprisonment did not make defendant's confession involuntary). See also United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir.) (suggestion by law enforcement that defendant might suffer while serving long prison sentence did not make ensuing statement involuntary), cert. denied, 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992); United States v. Nash, 910 F.2d 749, 752-53 (11th Cir. 1990) (officer's discussion of realistic penalties for cooperative and non-cooperative defendants did not make defendant's confession involuntary); United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (agents' threats of long prison sentence if defendant failed to cooperate did not make statements involuntary), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (confession voluntary even though defendant with below-average IQ was subjected to seven and one-half hour interrogation with agent who played on his emotions); Cf. Kilgore, 58 F.3d at 353 (statements voluntary despite evidence that defendant's motivation in confessing was to recover his impounded vehicle and not spend the night in jail). We find persuasive the fact that Wheeler did not make any incriminating statements or decide to cooperate until after Agent Mizell had given her Miranda warnings and had told her that she would not be arrested or charged that day. Thus, we conclude that Wheeler's will was not overborne by the agents when she decided to cooperate.

85 F.3d 1350-51.

The court finds that the defendant's will was not overborne by any type of coercion. The court finds that the defendant's waiver of his Miranda rights made in writing was voluntary. The court further finds the defendant's statement to Sergeant McClendon on December 15, 2005, was voluntary and is admissible in evidence at trial.

In light of the foregoing,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statement (Document #128) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Lewis M. Blanton
LEWIS M. BLANTON
United States Magistrate Judge

Dated: July 20, 2007.